IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Song Hun Baker, | ) | C/A No.: 1:12-2534-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

   This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable G. Ross Anderson, Jr.'s order dated September 10, 2012, referring this matter for disposition.  [Entry #6].  The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

   Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

On October 31, 2007, Plaintiff filed an application for DIB in which she alleged her disability began on January 1, 2006.  Tr. at 175–76.  Her application was denied initially and upon reconsideration.  Tr. at 112, 115.  On July 17, 2009, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Glen Watkins.  Tr. at 78–111.  The ALJ issued an unfavorable decision on September 14, 2009, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 120–31, 135–46.  On January 7, 2011, the Appeals Council remanded the case to the ALJ for further review.  Tr. at 147–50.  On June 17, 2011, Plaintiff amended her alleged onset date to December 21, 2009.  Tr. at 14. ALJ Gregory Wilson held a second hearing on June 21, 2011.  Tr. at 53–77.  On July 15, 2011, the ALJ issued a second unfavorable opinion, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 13–27.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 4, 2012.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 59 years old at the time of the second hearing.  Tr. at 175.  She attended school through ninth grade in Korea.[2]  Tr. at 85.  She moved to the United States in 1977.  *Id.*  Her past relevant work ("PRW") was as a spool winding operator and seamstress.  Tr. at 73–74.  She alleges she has been unable to work since December 21, 2009.  Tr. at 14, 57.

2.    Medical History

a.    Prior to Plaintiff's Alleged Onset Date of December 21, 2009

In June 2005, bilateral upper extremity electrodiagnostic studies revealed bilateral carpal tunnel syndrome (Tr. at 315), and bilateral lower extremity electrodiagnostic studies revealed bilateral neuropathy (Tr. at 316).  Plaintiff underwent a left carpal tunnel release in March 2006 (Tr. at 347–48), and a right carpal tunnel release and right trigger thumb surgery in January 2007 (Tr. at 327–28).  After each release, she reported being pleased with the results.  Tr. at 480, 487.  Following her first surgery, however, she stated that she was still having some pain.  Tr. at 486–87.

George R. Bruce, M.D., an orthopedist, examined Plaintiff on May 23, 2007, related to her workers' compensation claim.  Tr. at 414–17.  Examination revealed normal left shoulder muscle strength and only slightly reduced right shoulder strength, decreased range of motion in the right shoulder, and normal elbow and wrist strength

---

[2]  A vocational consultation report provides that Plaintiff completed her graduate equivalency diploma (Tr. at 122); however, she testified that she completed the ninth grade in Korea.

bilaterally. Tr. at 415–16. Dr. Bruce observed skin color change on Plaintiff's palm and stiffness in flexion of both hands, which he opined was early chronic regional pain syndrome. Tr. at 416. He further opined that Plaintiff's dysesthesia, hand numbness, and ankylosis of the right shoulder were caused by repetitive motion. *Id.* Dr. Bruce concluded that Plaintiff would "have difficulty with" overhead functions and repetitive use of her hands. Tr. at 417.

In June and July 2007, Plaintiff underwent three weeks of physical therapy for right shoulder pain. Tr. at 354–61. She reported having frequent and severe cervical pain that radiated down her arm. Tr. at 354. At her initial evaluation on June 20, 2007, physical examination revealed weakness in her right shoulder and decreased range of motion in her wrist and fingers. *Id.* The discharge summary dated July 11, 2007, indicates that Plaintiff reported "much less pain overall" and that she had met her goals related to range of motion and pain. Tr. at 361.

In July 2007, Plaintiff underwent a vocational consultation with Rock Weldon, a certified vocational evaluator. Tr. at 119–22. After completing a rehabilitation interview of Plaintiff and reviewing her medical records, Mr. Weldon opined that Plaintiff could not return to her PRW and was a poor candidate for other light or sedentary work. Tr. at 122. He noted that despite treatment for her shoulder and hands, Plaintiff continued to experience pain and limitation, especially with the use of her hands and arms. *Id.*

A questionnaire completed in December 2007 by a physician at Canyon Family Practice indicated that while Plaintiff suffered from anxiety and depression, she did not have any work-related functional limitations due to her mental conditions. Tr. at 418–19.

In December 2007, William B. Hopkins, M.D., a state-agency physician, determined that Plaintiff retained the physical residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour day; push/pull within her lifting capacity; climb ramps/stairs, balance, stoop, kneel, crouch, and handle/finger frequently; and climb ladders/ropes/scaffolds, crawl, and reach overhead with the right upper extremity occasionally; and that she had no visual, communicative, environmental, or other manipulative limitations.  Tr. at 365–69.

In January 2008, Craig Horn, Ph.D., a state-agency psychologist, concluded that Plaintiff had non-severe depression and anxiety.  Tr. at 373–86.  He opined that Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 383.

In a statement dated February 2008, Daniel J. Dahlhausen, M.D., Plaintiff's primary physician, indicated that Plaintiff had significant physical functional limitations, including the ability to sit, stand, and walk for one hour; an inability to reach overhead; and restrictions in the use of both hands.  Tr. at 584–85.  However, he indicated that he was not a "disability doctor" and noted that his opinion was based on Plaintiff's subjective responses rather than on an objective medical opinion.  *Id.*  Dr. Dahlhausen also noted that he was not aware of any neuropsychiatric or psychological condition that would affect Plaintiff's ability to return to work, but that she had some anxiety and depression.  Tr. at 584.

In April 2008, Steven J. Fass, M.D., a state-agency physician, determined that Plaintiff retained the physical residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour day; climb ramps/stairs, balance, stoop, kneel, crouch, and push/pull and handle/finger with the upper extremities frequently; climb ladders/ropes/scaffolds, crawl, and reach overhead with the right upper extremity occasionally; and perform work not requiring concentrated exposure to hazards such as machinery or heights, and that she had no visual, communicative, or other manipulative or environmental limitations.  Tr. 391–98.

In a statement dated May 2008, Dr. Dahlhausen indicated that Plaintiff had significant functional limitations.  Tr. at 400–04.  He opined that Plaintiff's symptoms often interfered with her attention and concentration; that she was only able to sit or stand/walk for less than two hours in an eight-hour workday; that she would be required to take unscheduled work breaks every hour during the workday; that she could occasionally lift less than 10 pounds; and that she had significant limitations doing repetitive reaching, handling, or fingering.  *Id.*

Dr. Dahlhausen examined Plaintiff in November 2008 for a "[d]iabetic check up."  Tr. at 649–50.  Examination revealed that Plaintiff was alert and well groomed, and demonstrated an appropriate affect, normal sensory functioning, the absence of lower extremity ulcerations, the absence of lower extremity tenderness, and the absence of lower extremity edema.  *Id.*  Plaintiff denied fatigue and skin abnormalities.  Tr. at 649.

Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled.  Tr. at 650.

Plaintiff was also treated by psychiatrist Geera Desai, M.D.  Tr. at 620–26, 666, 715, 781–83.  According to an undated psychiatric evaluation conducted by Dr. Desai, Plaintiff was tearful and paranoid.  Tr. at 620–21.  Dr. Desai diagnosed non-specific major depressive disorder and adjusted Plaintiff's medications.  Tr. at 621.  On December 4, 2008, Dr. Desai noted that increasing Plaintiff's Lexapro had not seemed to reduce her crying spells.  Tr. at 622.  He observed that she was visibly anxious, quite sad, tense, and uptight.  *Id.*  Dr. Desai prescribed Klonopin.  *Id.*  Two weeks later, Plaintiff reported that the Lexapro was working well.  Tr. at 623.  Dr. Desai noted that Plaintiff did not seem as agitated since starting Klonopin.  *Id.*  In January 2009, Plaintiff reported that she had no strength in her hand, but "trie[d] to cook and clean."  Tr. at 624.

Dr. Dahlhausen examined Plaintiff in February 2009 for a recheck of diabetes mellitus.  Tr. at 663–65.  Plaintiff reported feeling well with only minor complaints.  Tr. at 663.  Examination revealed that Plaintiff was alert and well groomed, and demonstrated an appropriate affect, normal sensory functioning, the absence of lower extremity ulcerations, the absence of lower extremity tenderness, and the absence of lower extremity edema.  Tr. at 663–64.  Plaintiff denied fatigue and skin abnormalities.  Tr. at 663.  Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled.  Tr. at 664.

In March 2009, Plaintiff reported to Dr. Desai that her depression was stable, but not where she wanted it to be.  Tr. at 626.

Plaintiff also saw Reba Richardson, LPC, for mental health counseling.  Tr. at 407–11, 629–30.  On November 23, 2008, Ms. Richardson noted that Plaintiff needed "to find something to do," including work, because she was becoming increasingly depressed by staying home all the time.  Tr. at 408.  In March through May 2009, Plaintiff reported that she was "doing okay" and "doing well."  Tr. at 629.

Dr. Dahlhausen examined Plaintiff in June 2009 for a recheck of diabetes mellitus.  Tr. at 680–81.  Plaintiff reported feeling well with only minor complaints.  Tr. at 680.  Examination revealed that Plaintiff was alert and demonstrated an appropriate affect, the absence of lower extremity edema, and a normal gait.  Tr. at 680–81.  Plaintiff denied fatigue, depression, and anxiety.  Tr. at 680.  Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled.  Tr. at 681.

In August 2009, Plaintiff reported to Dr. Desai that she was "doing ok," with "some mild depression."  Tr. at 751.  That same month, Plaintiff presented to Dr. Dahlhausen's associate complaining of a four-week history of mild arm pain.  Tr. at 709.

Dr. Dahlhausen examined Plaintiff on September 9, 2009, for a recheck of diabetes mellitus, and for complaints of left arm pain.  Tr. at 704–06.  She reported feeling well with only minor complaints, and Dr. Dahlhausen noted that Plaintiff had no current emotional problems.  Tr. at 704.  Examination revealed that Plaintiff was alert and demonstrated an appropriate affect, normal lower extremity inspection, the absence of lower extremity edema, and a normal gait.  Tr. at 704–05.  Plaintiff denied fatigue, depression, and anxiety.  Tr. at 704.  Dr. Dahlhausen diagnosed, among other diagnoses,

diabetes mellitus and related neuropathy that was controlled, and "pain in limb."  Tr. at 705.

Thereafter, in a statement dated September 22, 2009, Dr. Dahlhausen opined that Plaintiff suffered from insulin-dependent diabetes; diabetic neuropathy; chronic bilateral carpal tunnel syndrome; pain in shoulders, cervical spine, and neck; hyperlipidemia; depression; anxiety; and panic attacks.  Tr. at 693.  He further opined that Plaintiff's impairments affected her ability to sustain gainful employment and limited her ability to grasp, push, pull, reach above the shoulders, lift, and tolerate heat, cold, dampness, temperature changes, and dust.  *Id.*

Dr. Dahlhausen examined Plaintiff on September 29, 2009, for a follow-up of complaints of arm pain.  Tr. at 702–03.  Examination revealed that Plaintiff was alert and demonstrated an appropriate affect, normal lower extremity inspection, the absence of lower extremity edema, and a normal gait.  Tr. at 702–03.  Plaintiff denied fatigue, depression, and anxiety.  Tr. at 702.  Dr. Dahlhausen diagnosed diabetes mellitus and related neuropathy that was controlled, and "pain in limb[,]" and prescribed nonsteroidal anti-inflammatory medications and physical therapy.  Tr. at 703.

During left shoulder and upper extremity physical therapy in late 2009, a provider noted that Plaintiff had good recall of exercises (Tr. at 730), and Plaintiff reported that stretching was helpful (Tr. at 731).  A physical therapist noted that while Plaintiff had not attained normal left shoulder strength or ranges of motion, she had made good progress in increasing left shoulder ranges of motion, but that she "stopped coming."  Tr. at 716.

Dr. Dahlhausen examined Plaintiff in November 2009, for follow-up of complaints of left shoulder pain. Tr. at 675, 698. Plaintiff reported that physical therapy had been effective, but complained of having no energy. Tr. at 675. Examination revealed that Plaintiff was alert and demonstrated an appropriate affect, normal lower extremity inspection, the absence of lower extremity edema, and a normal gait. Tr. at 675, 698. Plaintiff denied depression and anxiety. Tr. at 675. Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled. Tr. at 698.

b.      Between December 21 and December 31, 2009

On December 21, 2009, Dr. Desai completed a statement indicating that Plaintiff suffered from major depressive disorder, anxiety, panic attacks, and difficulty speaking and understanding English. Tr. at 715. He opined that her mental impairments markedly affected her ADLs; caused moderate difficulties in maintaining social functioning and extreme deficiencies in concentration, persistence, or pace; and caused four or more episodes of decompensation. *Id.* He further opined that Plaintiff's conditions affected her ability to sustain any gainful employment. *Id.*

c.      After December 31, 2009, Plaintiff's Date Last Insured

Dr. Dahlhausen examined Plaintiff in January 2010, for follow-up of complaints of left shoulder pain. Tr. at 671–72. Plaintiff denied fatigue, depression, and anxiety. Tr. at 671. Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled, and "pain in limb[,]"and adjusted Plaintiff's diabetic medication regimen. Tr. at 672.

Dr. Dahlhausen examined Plaintiff in March 2010 for a recheck of diabetes mellitus. Tr. at 668–69. Plaintiff reported feeling well with only minor complaints. Tr. at 668. Examination revealed that Plaintiff was alert and demonstrated an appropriate affect, normal lower extremity inspection, the absence of lower extremity edema, and a normal gait. Tr. at 668–69. Plaintiff denied fatigue, depression, and anxiety. Tr. at 668. Dr. Dahlhausen diagnosed, among other diagnoses, diabetes mellitus and related neuropathy that was controlled. Tr. at 669.

Dr. Dahlhausen examined Plaintiff in May 2010 for complaints of symmetrical leg weakness. Tr. at 757–58. Plaintiff stated that the onset of the weakness had been gradual and had been occurring in a persistent pattern. Tr. at 757. Plaintiff also complained of dysphagia over the course of the prior year. *Id.* Plaintiff's examination was normal and she denied fatigue, depression, and anxiety. Tr. at 757–58. Dr. Dahlhausen diagnosed, among other diagnoses, fatigue and diabetes mellitus with controlled neuropathy. Tr. at 758.

Dr. Dahlhausen examined Plaintiff in August 2010 for a recheck of diabetes mellitus and complaints of foot burning. Tr. at 762–64. It was noted that Plaintiff was feeling well with minor complaints and had no current emotional problems. Tr. at 762. Dr. Dahlhausen diagnosed diabetes mellitus and related neuropathy that was uncontrolled, and diabetes-related polyneuropathy. Tr. at 763.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony[3]

At the hearing on June 21, 2011, Plaintiff testified that she lived with her husband and had not worked since 2005.  Tr. at 58.  She stated that she was unable to work because of depression, anxiety, and difficulty standing and sitting caused by back and leg pain.  Tr. at 59.  She said she had never been hospitalized for depression, but was taking medication to treat anxiety and depression.  Tr. at 61.  She testified that she had experienced back pain "for a while[,]" and began experiencing severe back pain starting three weeks before the hearing.  Tr. at 59, 64.  She stated that she had experienced neck pain "all along" and that she had "a little bit of neck pain on and on," but began experiencing more pain starting three weeks previously.  Tr. at 64.  She testified that she also suffered from diabetes, which caused her constant pain in her toes and legs.  Tr. at 61–62.  With regard to her carpal tunnel syndrome, she said that her surgery helped, but that she "had some pain all along" and that she started getting a lot of pain in her hand three weeks prior to the hearing.  Tr. at 65.  She testified that she had constant pain in her left shoulder that made it difficult to raise her hand and lift things.  Tr. at 66.

Plaintiff estimated that she could sit for 10 minutes without experiencing severe pain and could only lift one gallon.  Tr. at 59–60.  She testified that she "[took] care of" her husband, performed limited household chores, performed simple cooking, drove

---

[3]  Plaintiff's testimony from the first administrative hearing on July 17, 2009, is duplicative of Plaintiff's later testimony; thus, it is not summarized here.

occasionally, attended church services, and shopped occasionally.  Tr. at 67–69.  She said she was unable to take clothes out of the washing machine or fold them.  Tr. at 67.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carl Weldon reviewed the record and testified at the hearing.  Tr. at 72.  The VE categorized Plaintiff's PRW as a spool winding operator as unskilled, light work and as a seamstress as semi-skilled, light work.  Tr. at 73–74.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work; sit, stand, and walk six hours each out of an eight-hour workday; frequently push and pull; occasionally climb ropes, ladders, and scaffolds; frequently climb, balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the right upper extremity; frequently handle and finger; avoid concentrated exposure to hazards; and perform simple one-two step tasks with occasional contact with co-workers and the public.  Tr. at 75.  The VE testified that the hypothetical individual could perform Plaintiff's PRW as spool winding operator.  *Id.*  The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform.  *Id.*  The VE identified the jobs of industrial cleaner and hand packer.  *Id.*  The VE stated that his answers would be the same if the hypothetical individual were limited in reaching with the left upper extremity rather than the right.  Tr. at 76.  In response to another hypothetical in which the individual would be absent from work for some period of time on a daily basis, the VE stated that all work would be precluded.  *Id.*

2.    The ALJ's Findings

In his decision dated July 15, 2011, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of December 21, 2009 through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe combination of impairments: bilateral carpal tunnel syndrome; diabetes mellitus, type 2; back and neck pain; left shoulder pain; anxiety, and depression (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520 (d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work (lift, carry, push, or pull 50 pounds occasionally and 25 pounds frequently; stand or walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday) as defined in 20 CFR 404.1567(c) except with the following limitations: frequently push/pull, handle, and finger with bilateral upper extremities; occasionally climb ladder/rope/scaffolds and reach overhead with bilateral upper extremities; frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to hazards; perform simple, repetitive, and routine one and two step tasks; have occasional contact with the general public and coworkers.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a spool winder.  This work did not require the performance of work-related activities preluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 21, 2009, the amended alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(f)).

Tr. at 16–27.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to consider all relevant medical evidence in determining Plaintiff's RFC;

2)    the ALJ failed to properly evaluate the medical opinion evidence;

3)    the ALJ presented an incomplete hypothetical to the VE; and

4)    the ALJ did not properly evaluate Plaintiff's subjective complaints.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Opinion Evidence

Plaintiff asserts that the ALJ erred in his evaluation of the opinions of Drs. Dahlhausen and Bruce, and improperly relied on the opinions of the state-agency consultants, Drs. Hopkins and Fass.

a.    Dr. Dahlhausen

Plaintiff first contends that the ALJ erred in discounting the opinions of Dr. Dahlhausen, her primary physician.  [Entry #11 at 20].  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76

F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking a review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because the court's role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

In a statement dated February 2008, Dr. Dahlhausen indicated that Plaintiff had significant physical functional limitations, including the ability to sit, stand, and walk for one hour; an inability to reach overhead; and restrictions in the use of both hands. Tr. at

584–85.  However, he indicated that he was not a "disability doctor" and noted that his opinion was based on Plaintiff's subjective responses rather than an objective medical opinion.  *Id.*  Dr. Dahlhausen also noted that he was not aware of any neuropsychiatric or psychological condition that would affect Plaintiff's ability to return to work, but that she had some anxiety and depression.  Tr. at 584.

In a statement dated May 2008, Dr. Dahlhausen opined that Plaintiff's symptoms often interfered with her attention and concentration; that she was only able to sit or stand/walk for less than two hours in an eight-hour workday; that she would be required to take unscheduled work breaks every hour during the workday; that she could occasionally lift less than 10 pounds; and that she had significant limitations doing repetitive reaching, handling, or fingering.  Tr. at 400–04.

In an attorney-supplied questionnaire dated September 22, 2009, Dr. Dahlhausen opined that Plaintiff suffered from insulin-dependent diabetes; diabetic neuropathy; chronic bilateral carpal tunnel syndrome; pain in shoulders, cervical spine, and neck; hyperlipidemia; depression; anxiety; and panic attacks.  Tr. at 693.  He further opined that Plaintiff's impairments affected her ability to sustain gainful employment and limited her ability to grasp, push, pull, reach above the shoulders, lift, and tolerate heat, cold, dampness, temperature changes, and dust.  *Id.*  He completed a similar questionnaire on April 30, 2010, and opined that Plaintiff's conditions were probably permanent; caused problems with focusing on task, concentration, work production, and pace; and would cause her to be absent from work more than three days per month.  Tr. at 747.

The ALJ afforded Dr. Dahlhausen's opinions "some weight" and noted that they were not consistent with the doctor's treatment notes showing normal physical and mental examinations.   Tr. at 23.   The ALJ provided specific examples in Dr. Dahlhausen's records demonstrating normal lower extremity inspection, normal gait, no weakness, no emotional problems, and no anxiety or depression.  *Id.*  The ALJ also noted records indicating that Plaintiff felt well with minor complaints and had controlled diabetic neuropathy and no neurologic deficits.  *Id.*  The ALJ referenced a record stating that Plaintiff did not have any work-related limitations.  *Id.*  Finally, the ALJ noted that Dr. Dahlhausen indicated that he completed Plaintiff's disability papers based on her subjective complaints and stated that he did so while asking Plaintiff questions in his office.  Tr. at 23–24.

Rather than dispute the reasons provided by the ALJ for discounting Dr. Dahlhausen's opinions, Plaintiff identifies objective evidence that she believes support her symptoms.  [Entry #11 at 20].  Her argument, however, is unavailing because it is not within the court's province to reweigh the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence).

Plaintiff also takes issue with the following statement in the ALJ's decision:

[T]he possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that the patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely

in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

Tr. at 25.  Plaintiff argues that because the ALJ failed to confirm these motives and cites to no evidence in support of their existence, the ALJ's opinion is purely conjecture. [Entry #11 at 20–21].  While Plaintiff may be correct that the ALJ's statement was conjecture, any error by the ALJ was harmless because the ALJ provided a detailed explanation with record citations for discounting Dr. Dahlhausen's opinions.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").[6]

Based on the foregoing, the court finds that the ALJ provided valid reasons for discounting Dr. Dahlhausen's opinions and that his decision to do so is supported by substantial evidence.

### b.    Dr. Bruce

Plaintiff next contends that the ALJ failed to consider Dr. Bruce's opinions in their entirety and, consequently, erred in assessing her RFC.  [Entry #11 at 14–15].  Dr. Bruce, an orthopedist, examined Plaintiff on May 23, 2007, for purposes of a workers' compensation claim.  Tr. at 414–17.  Examination revealed normal left shoulder muscle strength and only slightly reduced right shoulder strength, decreased range of motion in

---

[6] Plaintiff's brief also includes a single sentence suggesting that the ALJ erred in disregarding the opinion of her treating psychiatrist, Dr. Desai, that she had debilitating psychiatric symptoms.  [Entry #11 at 20].  Because Plaintiff failed to include any meaningful discussion of this alleged error and failed even to reference Dr. Desai by name, the court concludes that Plaintiff has failed to demonstrate any error by the ALJ in assessing the opinion.  The court notes that the ALJ set forth several valid reasons for discounting Dr. Desai's opinion.  Tr. at 21.

the right shoulder, and normal elbow and wrist strength bilaterally.  Tr. at 415–16.  Dr.

Bruce observed skin color change on Plaintiff's palm and stiffness in flexion of both

hands, which he opined was early chronic regional pain syndrome.  Tr. at 416.  He further

opined that Plaintiff's dysesthesia, hand numbness, and ankylosis of the right shoulder

were caused by repetitive motion.  *Id.*  Dr. Bruce concluded that Plaintiff would "have

difficulty with" overhead functions and repetitive use of her hands.  Tr. at 417.

Plaintiff asserts that Dr. Bruce's report directly contradicts the ALJ's statement

that, after Plaintiff's carpal tunnel releases, "she never complained of carpal tunnel

syndrome."   [Entry #11 at 12].  Plaintiff misstates the ALJ's decision.  The ALJ stated

that while Plaintiff was undergoing physical therapy for related left arm pain, "she never

complained of her alleged carpal tunnel syndrome."  Tr. at 19.  The ALJ further noted

that from October 2008 through February 2011, Plaintiff did not complain of carpal

tunnel problems to her primary physician and that all of her physical examinations were

normal in this respect.  *Id.*  Finally, and most significantly, Dr. Bruce's opinion was

rendered two-and-a-half years prior to Plaintiff's alleged onset date.  Consequently, the

court finds that the ALJ did not err in failing to consider it, particularly in light of

Plaintiff's many normal visits to Dr. Dahlhausen after Dr. Bruce rendered his opinion.

To the extent the ALJ did err in his treatment of Dr. Bruce's opinion, the undersigned

finds that any such error was harmless because the ALJ adequately explained why he

found that Plaintiff's alleged carpal tunnel syndrome was not a severe impairment.  *See*

*Mickles*, 29 F.3d at 921; *see also* Tr. at 19.

c.     State-Agency Physicians

Plaintiff also argues that the ALJ erred in relying on the opinions of state-agency consultants Drs. Hopkins and Fass because, although they relied on the testing performed by Dr. Bruce, their opinions differed significantly from that of Dr. Bruce.  [Entry #11 at 19–20].   Specifically, Plaintiff asserts that the opinions of Drs. Hopkins and Fass that Plaintiff could frequently handle and finger with both upper extremities and occasionally perform lifting with the right upper extremity conflict with Dr. Bruce's opinion that Plaintiff would "have difficulty with" overhead functions and repetitive use of her hands. *Id.*  The Commissioner responds that the opinions are not in conflict because Dr. Bruce's opinion does not mean that Plaintiff lacked any capacity for performing overhead functions and repetitively using her hands.  [Entry #12 at 19].  Rather, the Commissioner argues the opinion suggested that Plaintiff was limited in her ability to perform these activities, which is consistent with the opinions of the state-agency physicians.  *Id.*

The undersigned agrees with the Commissioner.  Dr. Bruce did not find that Plaintiff was precluded from performing overhead functions and repetitive use of her hands.  His use of the words would "have difficulty with" suggests that while these activities may not be easy for Plaintiff, she is not entirely incapable of performing them. Drs. Hopkins and Fass gave credence to Dr. Bruce's opinion by concluding that Plaintiff's ability to handle, finger, and lift overhead was limited.  *See* Tr. at 368, 394. Because there is no inherent conflict in the opinion, the court finds that the ALJ did not err.  The court further notes that the ALJ stated that the opinions of the state-agency consultants were remote in time to the relevant time period in this matter.  Tr. at 24.  For

that reason, he also relied on the totality of the evidence and longitudinal medical record in making his decision. Tr. at 16. Thus, the court concludes that the ALJ did not place improper weight on the opinions of the state-agency consultants.

### 2.    RFC Determination

Plaintiff asserts that the ALJ failed to consider all relevant medical evidence in determining her RFC. [Entry #11 at 11]. Specifically, she contends that that the RFC assessed by the ALJ does not adequately account for the functional limitations related to her carpal tunnel syndrome, diabetes with related neuropathy, or bilateral shoulder pain. *Id.* at 11–14. Plaintiff also generally contends that it was unreasonable for the ALJ to find her capable of performing a limited range of medium work. [Entry #11 at 16–17]. She notes that if she had been restricted to a limited range of light work, she would not have been able to perform her PRW, and the Grids would have directed a finding of disability. *Id.*

The Commissioner does not dispute that Plaintiff had severe bilateral carpal tunnel syndrome, diabetes mellitus, and left shoulder pain; however, the Commissioner argues that Plaintiff has offered no evidence regarding these conditions between her onset date and her date last insured. [Entry #12 at 13–15]. The Commissioner further argues that Plaintiff has failed to demonstrate any functional limitations associated with these impairments in the records surrounding the relevant time period. *Id.*

### a.    Carpal Tunnel Syndrome

In support of her contention that the ALJ did not adequately take her carpal tunnel syndrome into account when determining her RFC, Plaintiff references the opinion of Dr.

Bruce that she would "have difficulty with" overhead functions and repetitive use of her hands. [Entry #11 at 12]. For the reasons set forth above, the undersigned does not find Dr. Bruce's opinion determinative on this point. The opinion significantly pre-dated Plaintiff's alleged onset date, and the ALJ provided specific reasons (including a lack of any carpal tunnel-related complaints to her primary physician from October 2008 to February 2011) for finding that Plaintiff's alleged carpal tunnel syndrome resulted in the following RFC limitations: frequently push/pull, handle, and finger with bilateral upper extremities. *See* Tr. at 19. The court finds that this aspect of the ALJ's RFC determination is supported by substantial evidence.

### b.    Diabetes Mellitus

Plaintiff argues that the ALJ erred in considering her diabetes because he stated that she was never referred for treatment by a specialist or for nerve conduction studies. [Entry #11 at 12]. Plaintiff points to a 2005 nerve conduction study to demonstrate that the ALJ's statement was in error and contends that the ALJ failed to comply with SSR 96-8p because he did not consider all relevant evidence of her impairments. *Id.* It is debatable whether a nerve conduction study performed four years prior to Plaintiff's alleged onset date is relevant. In any event, however, the court finds that any error by the ALJ was harmless because he provided numerous record citations demonstrating that Plaintiff's diabetes was controlled with medication. Tr. at 19–20. The ALJ also noted that Dr. Bruce stated that Plaintiff had no symptoms associated with her diabetes. Tr. at 19. The ALJ referenced two reports of diabetes-related neuropathy post-dating Plaintiff's date last insured and stated that, overall, her physical examinations were grossly normal.

Tr. at 20.   For these reasons, the undersigned finds that, with regard to Plaintiff's diabetes, the ALJ did not err in his RFC determination.

c.    Bilateral Shoulder Pain

Plaintiff asserts that the ALJ failed to adequately consider the pain in her shoulders in determining her RFC.  With regard to her left shoulder, Plaintiff asserts that although she was discharged from physical therapy in December 2009, the records indicate that she did not have a full range of motion or strength and that the goal of reducing her pain to two out of ten was not met.  [Entry #11 at 13].  Plaintiff fails to acknowledge that she was discharged from therapy because she stopped coming and fails to explain why she stopped attending therapy if she was continuing to experience problems with her shoulder.   In his decision, the ALJ noted that Plaintiff began experiencing mild left shoulder pain after hitting her arm on a doorway in August 2009.  Tr. at 20.  She attended 25 physical therapy sessions from October to December 2009, when she was discharged with a note indicating that she had made "good progress."  *Id.*

With regard to Plaintiff's right shoulder, the ALJ noted that an October 2004 MRI of the shoulder was normal and that Plaintiff had not complained of any right shoulder problems since well before the alleged onset date.  Tr. at 20.  Plaintiff asserts that the ALJ was mistaken in this finding and references Dr. Bruce's 2007 report, in which he noted decreased range of motion in Plaintiff's right shoulder and opined that Plaintiff's repetitive motion of her right shoulder had led to ankylosis of the shoulder.  [Entry #11 at 14].  The undersigned finds no conflict between the ALJ's decision and the existence of Dr. Bruce's report.   The ALJ stated that Plaintiff had not complained of any right

shoulder problems since well before the alleged onset date and Dr. Bruce's report is dated well before the alleged onset date. Plaintiff references no records closer in time to the alleged onset date to support her contention that her right shoulder pain affects her RFC.

Based on the foregoing discussion, the court finds no error in the ALJ's finding that Plaintiff's bilateral shoulder limitations result in the following RFC limitations: frequent pushing/pulling, handling, and fingering with bilateral upper extremities; occasional climbing of ladders, ropes, and scaffolds; and occasional overhead reaching with bilateral upper extremities.

Because the ALJ properly assessed Plaintiff's RFC, the court is not persuaded by Plaintiff's general argument that it was unreasonable for the ALJ to find her capable of performing a limited range of medium work.

### 3. Credibility Determination

Plaintiff next asserts that the ALJ failed to perform a proper credibility analysis. [Entry #11 at 17–19]. Specifically, Plaintiff contends that the ALJ failed to analyze her ADLs, incorrectly stated that she had received only conservative treatment, and failed to consider that her symptoms may have been attenuated because she was not performing her full-time job duties. *Id.* The Commissioner responds that the ALJ properly considered Plaintiff's complaints of disabling symptoms and properly concluded that they were not credible to the extent alleged. [Entry #12 at 22].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the

severity and persistence alleged.  *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence,

which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.[7]  Tr. at 19.

In discounting Plaintiff's credibility, the ALJ stated that Plaintiff's statements regarding her ADLs were not consistent with her alleged limitations; that she was not consistent in reporting her alleged limitations to her providers; that she received

---

[7] To the extent Plaintiff contends the ALJ erred in using this language [Entry #11 at 18], the court finds the argument unavailing.  The language used by the ALJ to state his credibility finding is the standard language used in all decisions.  Where, as here, the ALJ supported the finding with specific reasons for discounting the claimant's credibility, he has done all that he is required to do pursuant to SSR 96-7p.

conservative treatment and had never been referred to any specialists (except for mental health treatment) for imaging or surgery; and that she rarely, if ever, reported medication side effects.  Tr. at 22–23.  The ALJ noted that some of Plaintiff's conditions were well controlled with medication and that she had reported improvement following physical therapy.  Tr. at 23.

Plaintiff contends that while the ALJ found her ADLs not limited to the extent one would expect given her complaints of disabling symptoms, the ALJ provided no analysis of Plaintiff's ADLs.  [Entry #11 at 18].  Plaintiff's contention is incorrect.  In his decision, the ALJ noted that in September 2009, Plaintiff reported walking for 20 minutes daily.  Tr. at 17.  The ALJ also noted an October 2009 physical therapy record indicating that Plaintiff was unable to do her exercises over the weekend because she was too busy. *Id.*  Finally, the ALJ referenced Plaintiff's testimony regarding performing the following ADLs: cooking, washing dishes, washing and folding laundry, sweeping sometimes, vacuuming sometimes, cleaning the bathroom, going to church, shopping, and driving. *Id.*  Consequently, the ALJ provided ample support for his finding that Plaintiff's ADLs were not limited to the extent expected.

Plaintiff next asserts that the ALJ erred in finding that she received conservative treatment and was never referred to any specialists for imaging or surgery.  [Entry #11 at 18].  Plaintiff contends that the ALJ's finding is contradicted by her shoulder manipulation under anesthesia, carpal tunnel release surgery, prescription for a cock splint, and several courses of physical therapy. *Id.*  As an initial matter, a cock splint and physical therapy are neither imaging nor surgery and, thus, do not contradict the ALJ's

finding.  In fact, these are likely some of the treatments the ALJ considered in finding that Plaintiff underwent conservative treatment.  Plaintiff's shoulder manipulation and carpal tunnel release surgeries occurred well before Plaintiff's alleged onset date.  Furthermore, the ALJ specifically referenced the carpal tunnel release surgeries in his decision (Tr. at 19), thereby demonstrating that he considered them.  Thus, any error by the ALJ in stating that Plaintiff was never referred for surgery was harmless.  *See Mickles*, 29 F.3d at 921.

Finally, Plaintiff argues that, in assessing her credibility, the ALJ failed to consider that her symptoms may have been attenuated by the fact that she was no longer performing the repetitive motions required by her job.  [Entry #11 at 18–19].  Plaintiff cites to no authority requiring the ALJ to consider this as a factor.  Based on the several other factors set forth by the ALJ in discounting Plaintiff's credibility, the court finds that the credibility determination is supported by substantial evidence.

### 4.    VE Hypothetical

Plaintiff contends that the hypothetical presented to the VE was incomplete because it did not include a limitation on the repetitive use of hands.  [Entry #11 at 15].  This allegation is a restatement of Plaintiff's claim that the ALJ erred in assessing her RFC.  Because the undersigned has concluded that the RFC assessment is supported by substantial evidence, the undersigned finds that there was no error in the hypothetical presented by the ALJ to the VE.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 14, 2014                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge